Good morning. We have three cases for argument this morning. The first is number 23-3078 United States v. Ronell Moses Jr. Council for appellate take your time and whenever you're ready, please come up. Thanks, Ron. May it please the court. Jasmine Sola on behalf of appellant Ronell Moses. I would like to reserve three minutes for rebuttal. Grant. Thank you, Your Honor. This is a case about a warrantless search in Mr. Moses's driveway, just steps from Mr. Moses's home. Could you just as a preliminary matter, could you start with the standard of review that you think we should apply here? Yes, Your Honor. This court should apply de novo review to the curtilage question. It should do so for at least three reasons. The Supreme Court's holding in Ornelas abrogates this court's prior holding in Benesh. In Ornelas, the Supreme Court found that determinations such as reasonable suspicion and probable cause should be reviewed de novo. Those were legal questions that are suited for an appellate court. Okay, so but we know that there are some mixed back law questions that get reviewed for clear error. There are others de novo. This isn't the exact same question as in Benesh, as in Ornelas. So there's not an express abrogation overruling. Why should we treat it as impliedly overruling or undermining the holding that this different question gets clear error review? Yes, certainly, Your Honor. This undermines the prior holding that these determinations would be for clear error. Because what Ornelas suggests right is there are mixed questions of law and fact. And just like whether there is probable cause, whether an area is curtilage is a legal determination. We're not just asking is something a porch or a lot we are asking is something entitled to fourth amendment protection, just like whether an officer had probable cause. And that is although there are factual components, certainly, and those would be entitled to deference. The ultimate legal question is whether we want to protect an area and whether it's deserving of protection. So if a district court made a finding on one of the done factors that that the nature of as the nature of the uses to which the areas put and said, there's family gatherings once every two weeks, and there's a dispute, maybe it was once every two months. Do you think that that would be subject to clear error review? Or do you think that is something that we should look at de novo? Yes, Your Honor. So at least if there is a dispute about right, how often there were gatherings at the house, that would be entitled to be for clear air, right, that sort of factual finding. Ultimately, the weighing of the done factors is according weight, do we think this area is deserving of protection, but those underlying factual disputes, similarly about, you know, the height of the hedges, and structures, and other circuits that have considered this have done the same they found, okay, the court found, you know, the hedges were six feet tall, and we are going to review that for clear air. But the actual application of the factors in that ultimate legal question, whether the area is intimately tied to the home to be deserving of Fourth Amendment protection. You know, I don't want to direct you to a place that you don't want to go because you just got started. But yes, you know, these done factors, you know, a lot of the briefing in the district court, and now kind of centers on the done factors. It's a little strange to me, because if you read Jardines, Harding's, and Collins, it's almost like done was never decided. And so I just not even mentioned in one of the decisions. And so so I'm, you know, it feels kind of strange to sit there and say, yeah, most important for us front and center is to look at the done factors. When it's not just the passage of time, it's kind of how those factors have been treated by the Supreme Court. Should we get how much weight should we give those? I mean, even done is a little hesitant when it says, hey, you know, these are just, you know, done treats them as a heuristic, like, okay, talk about them. But the fact that maybe, arguably, three of them lean your way wouldn't be dispositive that it's three versus one, three automatically wins. Yes, I agree, Your Honor, done is not dispositive. And the law that is correct in Collins and Jardines, they did not mention the done factors. And I think this court, although they, you know, still have some relevance, right, they are as good as the setting done concerned, I think, a 200 acre ranch. And here we're talking about an urban setting a residential home. Also done came around during this cat's reasonable expectation of privacy era, right, before we get Jones, we get Jardines telling us that property matters, right, and we revive that trespass theory. And that's really the heart of Jardines and Jones, as well as Collins. So I think, at least in this day and age, and given kind of the lots we're looking at that done, you can consider those factors, but really, Collins decides this case for the court. Except let's go to Collins. So I went and pulled the photos of the driveways and the driveway in Collins, that car was past the front of the house. It's right up against alongside the house behind the motorcycle, snug up against it. It's about as close as you could get the SUV to the house here. You know, when you look at the photo of this car, it wasn't all the way up, there was another car in front of it. And so I think if you were in Collins, you might be able to look into the house, look into the window, hear sounds of what's going on in the house. This car might be far enough that you wouldn't hear, see, discern what's going on inside the private spaces of the house, maybe not even the deck. There's some kind of stairway up from there. So to the extent that we care about privacy, it seems like this case is meaningfully distinguishable from Collins. Yes, Your Honor. So I think first off within Collins, at least based on my understanding, was the search was of that motorcycle that was parked there, that was behind the car. They lifted the tarp up. And I believe that was the search that occurred. So I do think we were actually in somewhat a similar place. There was a car in front. We've got our motorcycle and they come on and search. But regardless, I think ultimately really what Collins tells us is those areas adjacent to the home. And in this setting, right, a driveway, just like a front porch, that is commonly where the home life extends. And that's what we have here. But the motorcycle looks like it's four feet. It's behind the front. Most of it's behind the front of the house. Most of it's in shade. You probably could see and hear something. There's some windows that right overlook it. But is it the case that the officer being pulling up right behind the car, et cetera, is going to discern anything private that's going on in the house, on the front stoop, et cetera? Is privacy compromised by the officers being where the officer was here? Yes, Your Honor. It certainly was. The officer came onto Mr. Moses's property more than halfway up his driveway. The steps were right next to the house leading to the home. The interesting thing to me is there's this sure case from a long time ago. And actually, it feels like it's really, really close because it talks about, and I don't even know if I care that it's a hot, I don't care about hot pursuit doctrines or exigent circumstances doctrines. I guess my point is when you're following somebody and you already have probable cause to make a stock, I understand that curtilage and homes are some notion that you have a right to retreat to your house. But it feels like insurer, they were like, yeah, pulling into a garage, just no problem with that. And so here, didn't even pull into a garage, just made it halfway up his driveway. So how do we reconcile this? It might not be under a curtilage doctrine developed so much insurer, but it feels like if that's permissible, stopping someone and searching the vehicle in a garage, why isn't stopping a vehicle halfway up a driveway permissible? Yes, your honor. So I think share is distinguishable for multiple reasons, but just the first thing that we've recognized since Collins and Hargines, we are in the curtilage, which is the home. At that point, then we need an exception to the warrant requirement. Okay. Consent is an exception. The Arizona Supreme Court in Hernandez, the district court in Kansas in Zabuck street. We're not talking about consent to search. We're talking about whether he consented to have the officer pull up behind him. So he could have pulled off on the street. Does he somehow immunize himself from being pulled over by pulling onto the officers presence on the driveway? We're not talking about consent to search, but consent to his presence on the driveway, at which point then he immediately smells the marijuana. I mean, he smells it before. Yes, your honor. So at least no, he did not implicitly consent to the officer coming on his driveway. This is much different than the cases cited by the government. Those involved ongoing chases where the officer was behind them for quite some time. I would urge the court to look at the dash camera footage, which shows that the officer turned on his overhead lights after Mr. Moses had turned on his left signal to pull into his driveway. And the officer had been following him for a while. Yes, your honor. Only about, I would say 20 seconds though. It's very quick. The officer, is it in the record how he smelled marijuana on driving on the highway? Yes, your honor. The officer did state that he was going in the opposite direction on not Mr. Moses's street, but on a different street. And he claimed to have smelled burning marijuana and then kind of did a U-turn to begin following Mr. Moses. So that's kind of how it all began. But just in terms of the facts, if Mr. Moses stopped on the street, no problem, right? Just no problem. If he would have sped into his driveway, got out of his car and ran full speed into his house, you might say, oh, you know what? That begins to look like we're going to get an exception to the warrant requirement because it looks like we have flight or something like this. And so if we kind of think about, hey, those are our two data points. If he stops on the street, that's licit. If he speeds into his driveway and runs into his house, that's licit. It seems like he's beating it by some sort of mid-range game where he says, I didn't do either. I just stopped in my driveway slowly, and now it's no longer licit to stop me. It seems that both endpoints can't both be true. And then there's an exception like a donut hole in the middle for just kind of turning in and saying, oh, I'll wait for him to come talk. I understand your concern, Your Honor. But we're not advocating for some sort of home based rule. Here, what happened was Mr. Moses was driving home. He pulled into his driveway. And even, Your Honor, if you are concerned about this could have happened on the public street, even if there was an implicit license for the officer to go onto the driveway to ask him some questions, there was not a license to search. Hardinis makes that clear. But the moment that he smells the burnt marijuana, that's enough, right? It's plain smell. Yes, Your Honor. We are not disputing that. But here, you cannot search in the cartilage based on probable cause. Collins made that explicit. They had probable cause to believe that motorcycle was stolen. They entered the cartilage. They lifted up the tarp and conducted a search. So while I absolutely- They had to lift it there, right? And so the lifting, it wasn't in plain view. This was within plain smell before the officer did anything else. I think that's the distinction. Your Honor, I don't think so. I guess first off with kind of plain smell, there needs to be a lawful right of access. And Collins tells us that the cartilage, there's not a lawful right of access under the automobile exception. You're out of time, but I do want to make sure I get your position on the third dung factor. So, you know, there's some ambiguity here. Are we supposed to focus on how Moses actually used this area of the driveway or how a reasonable officer would think it was used? I mean, you seem to focus on he did stuff in the driveway, but Dunn's phrasing talks about whether the facts indicated to the officers that the area wasn't being used for domestic purposes. How's an officer supposed to know that at other times they're throwing barbecues in the driveway? Why is your argument on that point relevant? Yes, Your Honor. So I think Dunn does describe, right, what an officer might know, but as courts have interpreted it and Justice Scalia, I believe concurring explains that really it is about the objective nature of the use. And I think even in this case, an officer would know in a residential setting like Mr. Moses, people use their driveways to park cars, to ride bikes. There doesn't need to be things littered in the driveway just to that this area is protected. And so I think ultimately what we have here, kind of our testimony from Mrs. Moses, that was the icing on the cake. We showed this driveway is used for what driveways are normally used for, the activities of the home life. Okay, thank you. We'll get you back on our bubble. Thank you, Your Honor. Mr. McHale, whenever you're ready. Good morning, Your Honors. May it please the court, Matt McHale for the United States. The government asked this court not to decide on a rule that would require a police officer here like Officer Hess, who had probable cause as of the moment that he was out on Universal Road and smelled that burning marijuana. How do you smell marijuana in driving in a car? How did, what would the record show here? Your Honor, I'd say two things. Number one, I was driving yesterday on the Vine Street Expressway with my windows rolled up and I believe I also smelled it from another vehicle in front of me with their windows rolled up too. And in this case, Officer Hess specifically testified that his windows were actually fully rolled down. He says it's a matter of officer safety and just awareness. He always, you know, typically, and in this case was driving with his windows down. Those seem to be connected to the standard of review, right? That we might question it more if we were, if we're using de novo as the effect, but you seem to take the position that the other side has forfeited this, but we said in U.S. Sugar, a party can't waive, concede, or abandon the applicable standard of review. Isn't that right? I appreciate that, Your Honor. Especially in the district court. And the government appreciates the focus letter. And I would state that actually having reviewed that case, we're comfortable with dropping our argument that they forfeited. All right. So let's talk about clear error versus de novo. Sure. How did those, is it, is it all clear error? Is there a portion that's clear error and a portion that's de novo? You know, so how do we piece those two things together as to say the smelling of the marijuana and the ultimate decision that yes, there was cartilage? Your Honor, I, so if this court continues with the clear error standard for everything, that would apply to both all those factual issues, the smelling of the marijuana, I would argue also the Dunn factors as well. All those sorts of findings would be reviewed for clear error. And then the ultimate judgment would also be reviewed for clear error. And I that is a factual determination for two reasons. Number one, I mean, Benesh says, and Mr. Moses below, and we all agreed, it's a, we describe it as a factual determination. And two, even the way that Collins talks about it, how you determine cartilage, they talk about it being based on one's daily observations, which to me is a little bit different from probable cause, reasonable suspicion, police officer. So I think the can stick with clear error. We win also on DeNovo. And, and, and to be clear, as I believe you were asking judge Bibas, even if the standard review is DeNovo there's no question under Ornalas and all the other Johnson from the ninth circuit and the other cases that have gone on to apply DeNovo to cartilage, that those historical findings of fact are afforded deference. And I believe my friend on the other side of the fact is that the car was parked 20 feet into the driveway, but it turns out it was really what 39, almost 40 feet, 39, eight, 39, nine, something like that. I mean, the testimony below was that it was 20 to 30 feet up the driveway and the driveway was 70 feet long. And there's measurements in the record from the defense expert that has, that sort of lays out. 25 and 15 something. Right. And on that point too, I would also note the court, I just direct the court's attention to one page in the appendix, appendix 270, which is actually an exhibit from the defense, which is a still screenshot taken from an officer's body cam, but looking backwards. And I would just say to me, the government's brief included a different image looking up. And I would just say that that appendix 270 helps. I mean, to me, that really drives home just how close to the street the car is. But so those, those determinations that judge Stickman made here. Does the government resist applying de novo? I mean, you know, Ornelas logic seems to favor this, you know, the historical facts. Okay. I get get clean air, clear air, but once we had those historical fact findings, can't we re-balance them and have some more case law and consistency going forward? Yes. I mean, I don't, again, I don't think it's necessary to decide in this case, which standard review applies, because I think under either standard, the government clearly wins. And Collins is, is very much distinguishable, not to mention the fact that this is an active traffic stop. Whether you call it hot pursuit or implied consent, there are all those exceptions. And then finally the good faith exception, which I think the court said, why don't you finish that? And then we'll come back to No, I'm sorry. You were saying on, even on de novo review, somehow you still win, but why is that? Well, your honor, the first thing I would say is that Ornelas was clear that historical findings of fact are still afforded deference. And that's why we were talking about how far he actually was in. I get that. Yeah. And I think that would include the district court's, you know, application consideration of the Dunn factors. Granted, it's not a mechanical test, you know, Dunn said that itself, but the questions about like the nature of the use, and I certainly share the questioning about how this officer is supposed to know how this portion of the driveway is used when he didn't even know that this was Mr. Moses until he was actually physically at the car, let alone, you know, and got Mr. Moses's driver's license, let alone whether it's used for barbecues, et cetera. But all those, those historical findings of fact are, are to be afforded deference here. And then if you, even if you sort of take a more Collins, Collins gestalt approach, I don't use, you know, maybe, I mean, some of the Dunn factors are, they match up with, with what Collins talked about. I mean, you talk about the proximity. The court ruled, the district court ruled in favor of Mr. Moses on proximity, did he not? It did, your honor. Yes. It found that that factor favored Mr. Moses. The other three favored the government. We, we advanced the argument on our brief on appeal that that, I mean, the reason for the district court's favoring him and not on that factor was because it said that the government conceded that point. I think the government was talking about something slightly different about exigent circumstances, but, but setting that aside, the other three factors favored the government, including the last one, which Mr. Moses himself said to the which is the steps taken to sort of, you know, screen the portion in question from, you know, from public view and the district court found as a matter of fact, I would suggest, and I think correctly that there, this, this was not a private part of the driveway. It was completely open to view from people down the street. You know, when, when I read kind of the the more recent cases, the, the Hardines and the, and the Collins, the sense I get is that really what cartilage is about it, cartilage issues really about what's animating it is kind of percipient advantage of proximity. And so you sit there and say, Hey, you got so close to the house that you could almost hear and see and perceive things in the house. This is justice that if you were in open fields or in public land or something that you wouldn't have this percipient advantage. We know that you're in cartilage when now you get so close that you've got a percipient advantage. And I, I almost think that this notion of percipient advantage, I don't know if, I don't know if it replaces the done factors, but it's clearly what animates, you know, Collins and Hardines much more than, than any of the done factors do. So do you think that, do you think that, that the officer got so close to the house in this case, that if there was something going on in the house, you know, that, that he would be able to see, hear, smell it at that point in the driveway that he couldn't, if he were on the public street, because if, if there were a percipient advantage as to what's going on in the house and then Hardines and Collins would almost suggest that, Hey, that's gotta be cartilage. Cause the whole point is to avoid the high powered binoculars, you know, hypothetical. Well, your honor, I mean, you know, to be honest, I would be guessing if I, I mean, I could, I mean, it's gotta be objective, a reasonable test. Right. So, I mean, sooner or later, like, like everyone's going to use some amount of judgment on this. Right. I mean, your honor, I, I don't know. I don't, I don't, I don't think officer Hess could have seen inside the house. No. Could he have smelled something inside the house? Couldn't have smelled from the street. It's really a comparison. You got to have the advantage. So, so you could maybe say, Hey, I was this close. I couldn't see anything in the house that I couldn't also see from the street. Therefore it can't be cartilage. But if I, if I've got my face pressed up against the glass of your dining room window, now I've got a percipient advantage. I mean, I, I agree with you that, that, that, that concept, I think may be motivating some of what's going on in Collins and Ardenas. I will say though, that, that whether, whether, because it's the ultimate question is objective reasonableness, obviously, or, you know, and not really relate because the precipitate advantage kind of maybe starts to sound like more of a subjective test. If you're talking about like, what could, what could this officer see or smell? And I will say that just a reasonable officer, I mean, could, could, could you see in, could you smell more marijuana? Could you hear sounds that you couldn't hear otherwise? I mean, it, it strikes me that a precipitate advantage framework shrinks cartilage in most cases, dramatically to the high powered binoculars example, looking in a window kind of proximity that Kagan talked about that was mostly tied to privacy rights. But you know, you gotta be pretty close for that to happen. Right. And I don't think that would, you know, be that sort of standard would be met in this case. And I would also say that Justice Kagan's opinion in Collins, when she lays out what daily observations tell us about whether that motorcycle in that case was, you know, on cartilage or not, and it was on cartilage in that case, she's talking about, I would say, pretty objective markers of, of location, front perimeter of the house, and that in Collins, it was, the motorcycle was behind the front perimeter of the house. Enclosure, it used the word, the Supreme Court used the word, the enclosure to describe the car height level walls that the motorcycle was surrounded on, on two sides, and then by the house itself on the third side. So those are mark, and then it was under a tarp. When you look at the pictures that were in this, in the appendix in the Supreme Court, and you look at the pictures here, kind of fairly similar. And also the Supreme Court said in Collins that that was an easy case. It's not even in a gray area. Yes, Your Honor, that is what the Supreme Court said. I, I mean, I respectfully disagree that, that the, and I would submit that it's, it's clearly distinguishable for the reasons I just stated about the motorcycle in Collins being behind the front perimeter of the house, which this case, it was not. Another reason is that the motorcycle in Collins was not on the path that members of the public would take to reach the front door. Whereas in this case, it was, it's undisputed testimony. The car here was parked right near the steps. Is that correct? It was, yes, Your Honor. And, and, and to, and I believe Mr. Moses's mother testified that when petitioners or whoever were, would come up to deliver or to knock on the front door, and you can see from the video, they would have to go exactly where this car was parked. And so for that reason, I would suggest no, Collins is distinguishable. Collins talks about the curdled being an area adjacent to the home to which the activity, the home extends, and also the, an area, well, basically to which the activity of the home life extends later on. This is pretty much the same thing. And now the parties here have said that they have had gatherings on that driveway. And it seems that would be a look back, not necessarily at the time of the arrest, but rather how the family actually conducts its familial business. Would it not? There was testimony to that effect, Your Honor. You know, I would say two things. Officer Hess had no way of knowing that at the time. And this was, he was in the middle of an active traffic stop and having to make sort of split second or very quick decisions based on incomplete information. And two, the district court took that information into account. It weighed it. I, you know, we suggest in our brief that, I mean, I think the, you know, the mother was testifying because her son was, you know, rung up on quite serious federal charges. I think if you look at her testimony, there was some vagueness or confusion. Sometimes she talks about, I mean, she admits to the driveway, we park our vehicles on the driveway. She talks about family gatherings taking place near that sort of low retaining wall. But then at other points, she also talks about the whole area. And then she's asked, what do you mean by whole area? And she says, well, I mean, the lawn, I mean, the house, I mean, the whole property. And then ultimately that's the district court. And again, if this is a de novo review case, I think the district court's weighing of that information, ultimately coming down on the side of the government and holding that the nature of the use here does not favor Mr. Moses, that's afforded deference under a clear air standard, because, you know, it's at least plausible that the district court found that here the use. Can I just tie something back to kind of like, you know, every now and then these Supreme Court cases cite to Blackstone. And, you know, and sometimes they cite to Blackstone for saying that, you know, curtilage is attendant to the burglary doctrine. Other times we have an Alito dissent that says really it's all about trespass. But either way you look at these kind of ancient notions of what curtilage may mean, it strikes me that there's kind of this objective understanding that there is a house and then it's curtilage. And if there's tenant A to the house, the house has the same curtilage as if there's tenant B, if there's tenant C, if there's tenant D, it's almost like it's something attendant to the house. But the more that we go to this done malleable factors, it could be that one tenant holds gatherings at a certain part of the yard all the time, and it's very public. Two years later, there's a new tenant there. They don't do that. And we've got this kind of curtilage and flux understanding. How does that reconcile with the common law? And then how does that reconcile what a reasonable officer is supposed to know when they show up on a vehicle stop? If they'd seen the house two years before, and they said, oh, there's never any gatherings here, but they missed two weeks ago. It seems that we've got at least underdone a malleable concept of curtilage, whereas Blackstone, at least my reading of it is it's not a malleable concept. It's attendant to the house itself. What do you think? My reading of Blackstone, I see my time is up. And if I can just respond briefly. So I would say two things briefly in conclusion. Number one, these questions about how is an officer supposed to know these things go ultimately to the good faith exception if the court needs to get there, which we think absolutely should apply in this case if necessary. But as far as your questions about Blackstone, I probably spent too much time delving into Blackstone here because I ultimately I don't know really how much application his discussion of curtilage has for this for the modern Supreme Court doctrine of curtilage. Because to me, I mean, it seems like for him, curtilage is goes it's like it's a concept that applies more to some kind of manner or a state, some large area of land. And there are many little other buildings in that area of land at this point for a long time. And certainly as Preston Collins, curtilage is much, much smaller than that. I mean, it exists. It's real. It's very important. It's entitled to full Fourth Amendment protections just as the house. But it is adjacent to the house in current case law. So I hope that answers your question. It is a little complicated, but here we do believe that there was not curtilage, even if there was, it was an active traffic stop, hot pursuit consent. And even if that's not the case, the good faith exception should apply. And we ask the court to affirm. Thank you, Mr. McHale. Thank you. Ms. Solo, you reserve a few minutes rebuttal after Mr. McHale is done. Come on up. May it please the court. The court in Collins made it clear. A search within the curtilage is impermissible without a warrant or an exception to the warrant requirement. Here, there was no exception. And Mr. Moses explicitly denied consent to search. The government is not contesting that a search occurred here and that curtilage, just like the home, is the first among equals. And it deserves that. You're right. But the key thing is we have to a determination has to be made as to whether this is, quote, curtilage, close quote. And you're saying it's like Collins, Mr. McHale saying it's different. And maybe for the sake of redundancy, why do you say this is so much like Collins on on these particular facts? Yes, Your Honor. So just like in Collins, Mr. Moses's car was parked around an enclosure around the home. It was right adjacent to the home, although it might have not been as close as Collins. It wasn't alongside. It was in front of and it was in front of some space. So it was further than in Collins. Yes, Your Honor. It was further than in Collins. But we still had those. It was still right next to the steps leading to the home. And we still had those markers of privacy, right? We had those tall hedges on the right or retaining wall to the left bushes at the front and a garage there. I also just think ultimately right in this era where we have driveways on compact lots, we're not talking about a really long winding driveway. We're talking about a driveway on a small lot next to the home, just like in Collins, as well as in Chong and Ninth Circuit case. Very similar. It was a small lot. It didn't matter that it wasn't enclosed. It didn't matter that it was visible from the street. But much like a front porch, a side garden, this driveway area in Mr. Moses's house was right next to his home. And that's why we're in curtilage. Just out of curiosity, where's the curtilage stop on this case? Yes, Your Honor. I mean, like by how many feet you think in your position, by how many feet you think the car was into the curtilage? You think it's like five feet in? I think it's 10 feet in? You think, you know, is enclosure what's doing the work for you? Does the curtilage go all the way out to the curb? Yeah. Your Honor, in this case, we would submit that the curtilage was the driveway given the small nature of it. The entire driveway. The driveway is 70 feet long. That's a bit, that's a bit much to say that. It's not all enclosed. So it was 30 feet from the actual house itself. But he was right next to the steps and the wall next to the steps. So that to me would be the argument for curtilage. But saying that, for example, if he had just pulled in, for example, the district judge said he's 20 feet pulled in, not 40. And that's probably wrong based on what we know. Yes. But let's say he was 20 feet in. How would that be curtilage? Yes, Your Honor. I think ultimately that's what Collins tells us, right? And same with Hardini's, that it's an area adjacent to the home to which the home life extends. We're not saying in all cases that the driveway is curtilage. It really is just looking to Mr. Moses's lot. But even if you disagree, right, that the curb, that's not curtilage. Here, we have the house, we have the park next to the steps leading to the house. If you watch the body camera footage, you will see that house looming in the background throughout this search. Do you know how long the driveway was in total in Collins? I don't know off the top of my head. But it was less than what we had here. That's certainly possible. I know at least in Alexander, I believe that was might have been longer, 80 feet, and that was curtilage. But I don't know. Where was the car in in Alexander? That was, so there was a person, he was kind of further back at the end of the driveway in Alexander. Collins, I'm not sure the length, but from the photos, it looks pretty similar, right? We're talking about these residential suburban settings. All right. Well, we thank you, both sides, actually, for a case that was very well briefed and well argued. I'd ask that a transcript be prepared and ask the government to pick up the We'd like to go off the record briefly and greet council over at Sidebar to thank you for coming today. Thank you.